UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| BRET STUMP, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )  No. 4:21 CV 37 |
| | ) |
| FRANCISCAN ALLIANCE, INC., | ) |
| | ) |
|     Defendant. | ) |

## OPINION and ORDER

This matter is before the court on defendant's motion for summary judgment. (DE # 29.) For the reasons that follow, defendant's motion is granted.

**I.  BACKGROUND**[1]

This employment discrimination case arises from plaintiff Bret Stump's employment with defendant Franciscan Alliance, Inc. (DE # 1.) Defendant hired plaintiff in April 2018 as a registered nurse. (DE # 29-1 at 2.) Plaintiff was the only male nurse on his unit. (DE # 35-1 at 21.) The "sister unit" to plaintiff's unit had two male nurses employed at the same time as plaintiff, who were also supervised by plaintiff's supervisor, Megan Zimmerman. (DE # 36-2 at 2.) Nurses would regularly float between the two units. (*Id.*)

---

[1] The following facts are undisputed for purposes of defendants' motion, unless otherwise noted.

On September 5, 2018, plaintiff failed to take vital signs for multiple patients. (DE # 29-2 at 2.) When questioned, plaintiff stated that he forgot to take the vital signs. (*Id.*)

Two days later, plaintiff disposed of a syringe with clear liquid still in it. (*Id.*) Plaintiff claimed that he poured the remaining narcotic medication into a sink, and then refilled the syringe with water and pushed the syringe to ensure that all narcotics were wasted. (*Id.*)

As a result of this medication issue, defendant performed two, two-week audits of plaintiff's medication administration and charting. (*Id.*) The audits revealed three instances, occurring in early October 2018, when plaintiff pulled medication but did not scan it into the electronic medical record. (*Id.*)

As a result of these scanning issues, plaintiff was asked to create a medication safety plan to correct the issue. (*Id.* at 3.) Plaintiff's supervisor, Zimmerman, met with plaintiff on October 12, 2018, to discuss and revise his medication safety plan. (*Id.* at 2-3.) Defendant also placed plaintiff on a corrective action plan (*id.*), though plaintiff does not recall receiving written notice of the corrective action. (DE # 29-4 at 10.) In his Initial Period Evaluation plaintiff received a "Needs Improvement" score of 1.2 out of 4.0 for his Quantity and Quality of Work. (DE # 29-2 at 3.) It is not clear from the evidence when the Initial Period Evaluation took place.

On October 15, 2018, defendant required plaintiff to reenter orientation so he could receive additional training and improve his nursing skills. (*Id.* at 4.) As part of

2

this reentry into orientation, plaintiff was asked to train for four weeks with Dianna Marshall, a seasoned nurse in a different unit, who would serve as plaintiff's preceptor. (*Id.*) A preceptor is a more experienced staff member who is responsible for training new hires or staff needing performance improvement. (*Id.*) As plaintiff's preceptor, Marshall was responsible for directing and documenting his education, and providing feedback. (*Id.*)

On October 15, 2018, the first day of plaintiff's additional training, Zimmerman received an email from a clinical nurse specialist stating:

> Diana (sic) [Marshall] is already almost beside herself with Brett (sic) and has a whole list of things he didn't do. I told her to keep track in case you guys need them. Some safety/monitoring concerns – he wants to set the dynamap to check post op vitals and not actually assess the patient.

(*Id.* at 5.)

On October 31, 2018, Marshall went into a patient's room and noticed the patient's IV tubing was cracked. (DE # 29-5 at 6.) Plaintiff was not in the room at the time, but had been the only one near the tubing. (*Id.* at 6, 16.) Marshall noticed that it looked like the tubing had been over tightened. (*Id.* at 6.) The patient commented, "[w]ell, he did have big hands," referring to plaintiff. (*Id.*) When plaintiff entered the room, Marshall said, "you and your monster sized hands broke the IV[.]" (DE # 35-1; DE # 35-13 at 2.) Plaintiff was offended by the comment, feeling that it belittled him in front of a patient based on his sex. (DE # 35-1 at 19.) Plaintiff's complaint alleges that this comment "prevailed upon the link in the cultural zeitgeist correlating the size of a man's hands with the size of his genitals." (DE # 1 at 2.)

3

Sometime during his additional training period, plaintiff told Jessica Jaeger, a nurse, that he did not understand why he was still on orientation when he had seen other people do worse things than he had done. (DE # 29-3 at 2.) He told her that he had seen John Stearns, his former supervisor, pull medication for one patient and give it to another patient. (*Id.*) Jaeger told Zimmerman about plaintiff's comment regarding Stearns. (*Id.*) Plaintiff testified that he had no knowledge of this incident with Stearns and had never spoken about it to anyone. (DE # 35-1 at 7.)

During his retraining period, plaintiff had several disagreements with Marshall relating to proper nursing practices. (DE # 29-2 at 5.) On November 2, 2018, Marshall approached plaintiff and told him that the IVs he had set up for a patient were "tied up in knots" and she had "had to cut every one of them down." (DE # 29-4 at 32.)

During this conversation, Marshall also accused plaintiff of not taking vital signs for a patient. (*Id.* at 33.) Plaintiff stated that he had taken the patient's vital signs, but he prefers to erase the Dinamap[2] and delete all the vital signs to protect patient information. (DE # 29-4 at 34.) Zimmerman later confirmed that plaintiff had, in fact, charted the vital signs in question. (DE # 29-7 at 20.) Zimmerman testified that Stump's practice of erasing the Dinamap and deleting all the recorded vital signs is a permissible practice, though unusual. (DE # 35-2 at 4.)

---

[2] Dynamap or Dinamap refers to the machine that monitors and records a patient's vital signs.

Marshall and another employee separately reported this heated exchange between Marshall and plaintiff to Zimmerman the day it happened. (DE # 29-2 at 5.) Marshall also discussed with Zimmerman her concerns about plaintiff's practice. (*Id.*)

Also on November 2, 2018, plaintiff filed an incident report accusing Marshall of hanging IV lines/tubing incorrectly and administering medication to a patient at a rate higher than prescribed. (*Id.*) Marshall had changed the IVs that she accused plaintiff of setting up incorrectly, and changed the rates at which the medications were delivered, increasing the dosage to 400% what was prescribed by the physician. (DE # 35-1 at 6.) Zimmerman reviewed the incident report and found that plaintiff's concerns were unsubstantiated because Marshall's action of running the antibiotic through the IV line at a higher rate was permissible nursing practice given that there were multiple medications that needed to be administered to that particular patient. (DE # 29-2 at 5.)

That same day, plaintiff called Zimmerman's cell phone. (DE # 29-7 at 22.) He told her that something shocking had happened at work, but that they could talk about it the following day. (DE # 35-8 at 1.) On November 4, 2018, plaintiff spoke to Zimmerman over the phone, sharing his concerns regarding the November 2nd incident between himself and Marshall. (DE # 29-2 at 6.)

On November 5, 2018, Zimmerman met with Ann Shallenberger, defendant's manager of employment, to discuss additional concerns that had arisen about plaintiff's performance, and to prepare for a meeting scheduled with plaintiff that afternoon. (*Id.* at 7.) Zimmerman told Shallenberger about Marshall's concerns about plaintiff's

5

performance during his additional training period, his controlled substance management, inability to work with a preceptor, and concern that plaintiff did not report that Stearns had administered medication to the wrong patient. (*Id.*)

Later that day, Zimmerman met with plaintiff, Marshall and Jaeger. (*Id.*) Marshall brought up concerns about plaintiff's documentation practices. (*Id.*) The parties also discussed the heated exchange between plaintiff and Marshall on November 2nd. (*Id.*) Plaintiff told Zimmerman that he was upset by Marshall's "monstrous hands" comment, and stated that he believed the comment was sexist and rude. (*Id.*; DE # 29-6 at 6.)

Plaintiff claims that during this meeting Marshall told him that he should not be in nursing because he is a man. (DE # 35-1 at 4.) He later clarified that Marshall only ever told him that he should not be a nurse, and he interpreted her statement to be related to his gender. (*Id.* at 19.)

After the meeting, Zimmerman was helping plaintiff enter documentation into the computer system. (DE # 35-1 at 8.) Zimmerman asked plaintiff whether he had seen memes on Facebook that show nurses wanting to start IVs on individuals with larger veins. (DE # 29-7 at 4.) Zimmerman stroked plaintiff's arm and told him that he has very nice veins and a very big arm. (DE # 35-1 at 8-9.) Jaeger testified that she has seen Zimmerman touch other staff members' forearms and tell them that they have great veins. (DE # 29-6 at 10.) Marshall testified that Zimmerman once ran a finger down Marshall's veins after Marshall commented that she has bad veins. (DE # 29-5 at 17.)

6

On November 7, 2018, Zimmerman, Shallenberger, and defendant's clinical director Julie Norris, met and decided to suspend plaintiff pending termination based on the concerns with his job performance. (DE # 29-1 at 4.) It is defendant's practice that, when it decides that termination of an employee is appropriate, the employee is first suspended pending termination, in order to allow the employee to respond to the conduct for which they would be terminated, and then evaluate whether that additional information changed the termination decision. (*Id.*)

Later that day, plaintiff was informed of his suspension pending termination. (DE # 29-2 at 8.) After being notified of his suspension, plaintiff claimed that he had been sexually harassed. (*Id.* at 9.) Zimmerman called Shallenberger to the meeting, so that plaintiff could share his concerns. (*Id.*) Plaintiff spoke to Shallenberger alone and told her that he believed he had been subjected to sexual harassment and gender discrimination. (DE # 29-1 at 4.) Shallenberger documented his concerns and gave him a copy of defendant's harassment policy and two copies of a form he could use to submit his complaints in writing. (*Id.* at 5.)

Plaintiff submitted his complaints on November 14, 2018, citing Marshall's statement about his "monster sized hands" breaking the IV tubing, and Zimmerman touching his arm and telling him he that he has nice veins. (DE # 35-13.) Defendant's human resources department's investigation found plaintiff's allegations to be unsubstantiated and determined that the conduct did not constitute sex discrimination or sexual harassment. (DE # 29-1 at 5.)

7

On November 28, 2018, defendant informed plaintiff of the final decision to terminate his employment, citing patient care concerns, medication issues, and his inconsistent and contradicted recollection of events. (DE # 35-9 at 1.)

Defendant maintains a progressive discipline policy. (DE # 35-6 at 2.) The policy allows for skipping steps in the disciplinary process.[3] (*Id.*; DE # 35-3 at 2.) At least one step in the progressive discipline policy was skipped when defendant terminated plaintiff's employment. (DE # 35-3 at 2.)

As a result of these events,[4] plaintiff filed the present suit, alleging that defendant is liable for discrimination and retaliation on the basis of his sex under of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2(a)(1), e-3(a). Defendant now moves for summary judgment on plaintiff's claims. (DE # 29.) This matter is fully briefed and is ripe for ruling.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to

---

[3] Defendant claims that the progressive discipline policy permits skipping steps in instances where there are medication errors and integrity concerns. However, defendant did not provide the portion of the record it cites for this claim; therefore, the court cannot consider this fact in resolving the pending motion.

[4] Plaintiff's Statement of Genuine Disputes fails to comply with the Northern District of Indiana's Local Rule 56-1. Counsel is cautioned that any future failure to comply with the local rules could result in the court summarily striking the non-compliant Statement of Genuine Disputes. *See e.g. Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 710 (7th Cir. 2015); *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014).

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson*, 477 U.S. at 248; *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

### III.    DISCUSSION

   *A.    Discrimination Claim*

Title VII prohibits intentional discrimination in employment on the basis of statutorily proscribed factors, including sex. 42 U.S.C. § 2000e-2(a)(1). In the present case, as in many discrimination cases, the parties' dispute hinges on causation: whether plaintiff's sex caused his discipline and termination. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Direct as well as circumstantial evidence may support an inference of causation, and thus intent." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020). "To clarify and to simplify her task, a plaintiff may choose to enlist the burden-shifting framework of *McDonnell Douglas*," *id.*, but use of *McDonnell Douglas* is not required. *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 601 (7th Cir. 2020). In this case, neither party frames their analysis under *McDonnell Douglas*.

A plaintiff may also prove discrimination "in a holistic fashion, by proffering direct or circumstantial evidence of intentional [] discrimination." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (cleaned up). There are three broad types of circumstantial evidence that will support an inference of intentional discrimination: "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d at 929.

Plaintiff argues that Marshall made suggestive comments that support a finding of discrimination. Plaintiff testified that Marshall told him that he should not be a nurse

because he is a man. However, later in his deposition, plaintiff clarified that he merely interpreted her statement that he should not be a nurse, to mean that he should not be a nurse because he is a man. (DE # 35-1 at 19, "That's my feeling of what she was saying.") He testified that Marshall never told him why she thought he should not be a nurse. (DE # 35-1 at 19.)

Plaintiff also points to Marshall's statement that he broke the IV tubing with his "monstrous hands," as evidence of discrimination. Taking this statement in the light most favorable to plaintiff, it is reasonable to infer that Marshall's comment was implicitly a comment on his sex, though – given the context in which the statement was made – it is not reasonable to infer that Marshall's comment was a reference to the size of his genitals, as plaintiff insists. The problem for plaintiff, however, is that there is no link between this statement and his discipline. Marshall was not a decision-maker in his suspension or termination, and plaintiff is not proceeding on a cat's paw theory. Moreover, none of the reasons identified in his termination paperwork are based on any statement from Marshall. (*See e.g.* 35-9.)

Plaintiff argues that Zimmerman's touching of his arm and commenting on his veins is sexually suggestive conduct that supports a finding of discrimination. Plaintiff's theory is that Zimmerman decided to suspend him two days after her sexual advance because she was worried that he might report the incident. (DE # 34 at 23.) Yet, the evidence demonstrates that Zimmerman has similarly touched other employees, including women; therefore, this incident does not serve as evidence of sex

11

discrimination. *See e.g. Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1117 (7th Cir. 2022); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009).

Next, plaintiff argues that defendant treated Marshall, a woman, more favorably than him. He argues that Marshall committed a mistake similar to the ones he made, but he was disciplined and she was not. More favorable treatment toward someone who is not in the protected class may support an inference of discriminatory intent *if* they are similarly situated, meaning that they are "directly comparable to the plaintiff in all material respects." *Alley v. Penguin Random House*, 62 F.4th 358, 363 (7th Cir. 2023) (citation and quotation marks omitted). Here, plaintiff has not put forth evidence that he and Marshall are comparable in all material respects. Furthermore, defendant investigated the incident and determined that Marshall did not commit any error. Plaintiff has not set forth evidence that would cast doubt on the sincerity of that finding.

Plaintiff claims that defendant ignored its own policies in disciplining him. While it is undisputed that steps in the progressive discipline policy can be skipped in certain situations, there is no evidence in the record as to when skipping a step is appropriate. Taking the evidence (or lack thereof) in the light most favorable to plaintiff, the court will assume that defendant skipped a step in its progressive discipline policy, without justification under that policy.

Plaintiff also claims that he was improperly disciplined for erasing vital signs on the Dinamap, even though Zimmerman testified that this practice was permitted. (DE # 34 at 16.) However, it does not appear that plaintiff was disciplined for his underlying

12

practice, but rather for his inconsistent answers when questioned about his practice. The termination paperwork identified plaintiff's explanations regarding his erasure of the vital signs as one instance of his inconsistent and contradicted recollection of events, resulting in concerns regarding the integrity of his practice.

Finally, plaintiff claims that he was wrongly disciplined for denying that he told Jaeger that he witnessed Stearns administering medication to the wrong patient. He claims that when he was asked about the incident during the November 5th meeting, he stated that he did not tell Jaeger about Stearns, or if he did, he does not remember. He argues that he was wrongly disciplined for failing to remember a conversation. Plaintiff's argument is directly contradicted by his deposition testimony, in which he testified that he "had no idea that incident [regarding Stearns] ever occurred," and when asked about it during the November 5th meeting, he stated "I have no idea what you're talking about." (DE # 29-4 at 31.) He also testified that he told Zimmerman that he never had a conversation with Jaeger about Stearns, and "I have never heard of this incident and never have spoken to anybody about it[.]" (DE # 35-1 at 7.)

The ultimate problem with plaintiff's discrimination claim is that there is insufficient evidence suggesting a causal connection between his sex and his termination. True, Marshall made a biased comment about the size of his hands cracking IV tubing; however, plaintiff has failed to link any bias Marshall may have had, with his discipline and eventual termination. *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) ("Standing alone, biased comments do not establish

13

discriminatory motive unless they were by the decision maker and can be connected to the decision."). In fact, none of the reasons given for his termination rely on Marshall's evaluation of his performance. Rather, in any incident involving Marshall, the concerning behavior is plaintiff's changing accounts for his prior actions, rather than the action itself.

Even considering Marshall's statement in conjunction with defendant's skipping of a step in its progressive discipline policy, there is simply not enough evidence to raise a reasonable inference that plaintiff's sex was the true reason for his discipline and termination, rather than the continuous problems with his work performance. Plaintiff had already been disciplined for numerous medication errors and was placed into reorientation before the allegedly discriminatory actions took place. Considering the evidence as a whole, no reasonable fact-finder could find that defendant discriminated against plaintiff on the basis of his sex.

    B.    *Harassment Claim*

A sexual harassment claim under Title VII requires a plaintiff show: "(1) her work environment was objectively and subjectively offensive, (2) the harassment she complained of was based on her gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018) (citations omitted). "A successful hostile work environment claim based on sexual harassment need not involve sexual conduct, but

14

can be successful by showing the work environment was sexist." *Id.* "This showing must still include evidence that the environment was 'severe or pervasive' and requires proof of both an objective and subjective component." *Id.* (quotation omitted).

To determine whether a plaintiff's work environment is objectively offensive, the court must consider "the severity of the conduct, its frequency, whether it is merely offensive as opposed to physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance." *Id.* at 881. "The prohibition of harassment on the basis of sex . . . forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment. " *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 472 (7th Cir. 2012) (internal citation omitted). "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Scruggs*, 587 F.3d at 840-41. In determining whether a work environment was sufficiently severe or pervasive the court must "look to the totality of the circumstance and ask whether everything together constitutes a hostile or abusive environment." *Swyear*, 911 F.3d at 881. Finally, the court assumes "employees are generally mature individuals with the thick skin that comes from living in the modern world, " thus, "employers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Id.*

In this case, plaintiff testified that he was offended by Marshall's comment about his hands, and Zimmerman's touching of, and comment about, his arm. The question,

therefore, is whether this conduct was objectively severe or pervasive enough to establish employer liability. The court finds that it was not. First, as discussed above, Zimmerman's conduct cannot serve as the basis of a sexual harassment claim, because she touched and commented on the veins of men and women.

Second, these incidents, while unprofessional, were not so severe or pervasive as to alter the conditions of plaintiff's employment. In fact, these incidents are relatively minor compared to some the appellate court has reviewed and determined to be insufficiently severe or pervasive. *See e.g. Scruggs*, 587 F.3d 841 (plaintiff's supervisor's occasional inappropriate comments, including that she was "made for the backseat of a car," looked like a "dyke," and that he hated "pushy, aggressive women" like plaintiff, were insufficient to establish an objectively hostile work environment); *Swyear*, 911 F.3d at 882 (co–worker's sexual advances did not create hostile work environment); *see also Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) (if few and far between, acts such as a hand on the shoulder, a brief hug, or a peck on the cheek will typically not be severe enough to be actionable in and of themselves. "Even more intimate or more crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the buttocks—may be considered insufficiently abusive to be described as 'severe' when they occur in isolation."); *Davis v. Papa John's USA, Inc.*, No. 21-1735, 2021 WL 5154105, at *2 (7th Cir. Nov. 5, 2021) (unpublished) ("[A]n isolated touch on the shoulder and one crude insult are not objectively severe or pervasive enough to be actionable under Title VII.").

16

Plaintiff may have been offended or embarrassed, but the conduct was not sever or frequent, was not physically threatening, and did not interfere with plaintiff's work performance. On the whole, plaintiff was not subjected or severe or pervasive sexually harassing behavior. Accordingly, defendant is entitled to summary judgment on plaintiff's sexual harassment claim.

    C.    *Retaliation Claim*

Finally, defendant seeks summary judgment on plaintiff's retaliation claim. Plaintiff's retaliation claim is not precluded by the fact that defendant is entitled to summary judgment on the underlying discrimination claim. *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007).

"Title VII forbids employers from retaliating against employees for engaging in statutorily protected activities by opposing an unlawful employment practices or participating in the investigation of one." *Swyear*, 911 F.3d at 884–85 (citing 42 U.S.C. § 2000e–3(a); *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)). To determine whether plaintiff's claim survives summary judgment, the court considers "whether the evidence produced would permit a reasonable factfinder to conclude the plaintiff's sex caused the discharge." *Id.* at 885 (citing *Ortiz*, 834 F.3d at 765).

There are two ways a plaintiff may prove a *prima facie* retaliation claim, the direct method and indirect method. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). "The direct method requires the plaintiff to simply present evidence satisfying the elements of the retaliation claim: (1) he engaged in a protected activity, (2) he suffered an adverse

17

action, and (3) a causal connection exists between the activity and the adverse action." *Id.* Alternatively, under the indirect method, a plaintiff may prevail upon the *McDonnell Douglas* burden-shifting framework to establish a *prima facie* case of retaliation, without proving a direct causal link. *Id.* In this case, plaintiff has chosen to proceed with the direct method. However, regardless of which method a plaintiff chooses, the court must ultimately consider the evidence as a whole to determine whether the evidence would permit a reasonable fact-finder to conclude that plaintiff's protected activity caused the adverse employment action. *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018).

In his brief, plaintiff argues that defendant terminated his employment because he complained about sexual harassment. Plaintiff stakes his entire retaliation claim on the fact that the decision-makers knew he believed he had been subjected to sexual harassment prior to his suspension and termination. He points to the fact that two days prior to his suspension he told Zimmerman that he believed Marshall's comment about his hands was sexist and rude. He also points to evidence that the other decision-makers knew, prior to his termination, that he believed Marshall's comment and Zimmerman's touch of his arm amounted to sexual harassment.

In light of his continued performance issues, no reasonable jury could determine that Zimmerman suspended him because he complained about Marshall's comment and was offended that she touched his arm. The evidence demonstrates that plaintiff's work performance repeatedly fell-short of defendant's expectations, culminating in

18

disciplinary action that happened to coincide with his complaints. Because there is no evidence that his complaints *caused* his discipline, his retaliation claim cannot survive summary judgment. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (an employer need not suspend a previously planned action upon learning of a discrimination complaint, and its decision to "proceed[] along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Swyear*, 911 F.3d at 885 (plaintiff whose conditions of employment were changed for the worse after reporting co-worker's sexual advances failed to establish retaliation claim where she failed to establish she was meeting employer's legitimate expectations or that employer's stated reason for her termination was pre-textual).

## IV.  CONCLUSION

For these reasons, defendant's motion for summary judgment (DE # 29) is **GRANTED.** The court directs the Clerk to **ENTER FINAL JUDGMENT** stating:

> Judgment is entered in favor of defendant Franciscan Alliance, Inc., and against plaintiff Bret Stump, who shall take nothing by way of the complaint.

**SO ORDERED.**

Date: September 1, 2023

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT